# In the United States Court of Federal Claims

No. 21-1198L

(Filed: November 7, 2023)

|  |  |
|---|---|
| **MIDAS RESOURCES, INC.,** *et al.,* | ) ) ) |
| *Plaintiffs,* | ) ) |
| **v.** | ) ) |
| **UNITED STATES OF AMERICA,** | ) ) |
| *Defendant.* | ) ) ) |

*Nicholas P. Laurent*, Barron, Adler, Clough & Oddo, LLP, Austin, TX, for Plaintiffs.  With him on the briefs was *Roy R. Brandys*.

*Matthew P. Rand*, Trial Attorney, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Todd Kim*, Assistant Attorney General, Environment & Natural Resources Division, and *Kimberly A. Cullen*, Trial Attorney.

## OPINION AND ORDER

**SOLOMSON**, **Judge.**

King Midas may have been able to turn everything into gold simply with his touch, but Plaintiffs — Midas Resources, Inc., and Los Torritos, LLC (collectively "Midas") — cannot magically transform their regulatory takings claim into a physical takings claim. Having expressly abandoned the former, no amount of alchemy can save their case from dismissal.  With a complaint that it amended twice, Midas has had three chances to allege sufficient facts to support a takings claim, but has not done so.  The Court thus agrees with the government that Midas's claim must be dismissed as a matter of law pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").  Moreover, to the extent that Midas's takings claim depends on future government actions, the claim is not ripe and must be dismissed pursuant to RCFC 12(b)(1).

1

## I.      Procedural History

On April 13, 2021, Midas filed its complaint in this court, alleging a single count for just compensation pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Fifth Amendment of the United States Constitution, for an alleged physical taking of Midas's mineral estate.  ECF No. 1 ¶ 1, 14-15 ("This physical taking is permanent in nature and duration.").

On October 8, 2021, the government filed a motion to dismiss Midas's initial complaint, pursuant to RCFC 12(b)(1) and RCFC 12(b)(6).  ECF No. 8.  After the parties had fully briefed the motion, the Court held a status conference, ECF No. 12, to address the government's motion.  *See* ECF No. 15 (December 9, 2021, status conference transcript).   Following the status conference, the Court denied, as moot, the government's motion to dismiss because the Court concluded that Midas should be given an opportunity to amend its complaint.  The Court explained its decision as follows:

> At this stage, of course, the Court presumes that the factual allegations in Plaintiffs' complaint — but not its legal conclusions — are true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).   Given that standard, and given the approach the government took in its motion to dismiss, the better course here is to permit Plaintiffs another chance to frame their takings theory with a more robust set of factual allegations.  If the government is correct that an amended complaint is futile, the government should easily be able to repackage and refile its motion to dismiss.  On the other hand, the Court cautions Plaintiffs that they are highly unlikely to receive another proverbial bite at this takings apple.  And even if Plaintiffs can provide more details, such additional facts — if assumed to be true — must still translate to a cognizable takings claim in order to proceed.

ECF No. 13.

On January 17, 2022, Midas filed its first amended complaint.  ECF No. 16.  As sure as day follows night, the government once again moved to dismiss.  ECF No. 18.  After yet another round of briefing — including regarding several related motions from Midas to supplement its first amended complaint — the Court scheduled oral argument for June  9, 2022.  ECF No. 27.

On June 5, 2022, the parties requested a telephonic status conference to discuss case developments.  The Court held a status conference on June 7, 2022.  ECF No. 28. Following that status conference, the government filed a consent motion representing

that a declaration it submitted with its original motion to dismiss, ECF No. 8-1, was "inaccurate." ECF No. 29 at 1. The government further represented that some of the arguments in its motion to dismiss Plaintiffs' first amended complaint were "premised on allegations that are also inaccurate." *Id.* Accordingly, the government requested that: (1) the inaccurate declaration, ECF No. 8-1, be withdrawn; (2) Plaintiffs be granted leave to file a second amended complaint on or before June 24, 2022; (3) the Court set a new deadline for the government to file its answer or motion to dismiss the second amended complaint; (4) the government's motion to dismiss Plaintiffs' first amended complaint be deemed moot; and (5) the Court vacate the oral argument scheduled for June 9, 2022. *See* ECF No. 30 (summarizing the government's consent motion). The Court granted the consent motion. *Id.*

On June 24, 2022, Midas filed its second amended complaint. ECF No. 31 ("SAC"). The government for a third time filed a motion to dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(6). ECF No. 32. Midas responded to that motion, ECF No. 33 ("Pl. Resp."), and the government filed a reply memorandum in support of its motion, ECF No. 34. The Court held oral argument on September 20, 2022, ECF Nos. 35, 39 (September 20, 2022, oral argument transcript ("Tr.")).

Following oral argument, the Court concluded that supplemental briefing was necessary. ECF No. 37. The parties filed timely supplemental briefs, supported by various documents and declarations. ECF No. 42 ("Def. Supp. Br."); ECF No. 43 ("Pl. Supp. Br."). Midas filed a response to the government's supplemental brief, ECF No. 45, and the Court ordered the government's reply, which was filed on November 9, 2022. ECF No. 47.

## II.    Factual Background[1]

Midas leases a mineral estate in Hidalgo County, Texas, near the U.S.-Mexico border. SAC ¶ 2. More specifically, the Midas "lease interests" consist of "608.26 acres, more or less, being more particularly described . . . in that Designation of Pooled Unit known as the Mary Bell Doffing Gas Unit, dated March 10, 2008, and recorded on March 12, 2008[,] as Document No. 1866748 in the Official Records of Hidalgo County, Texas." *Id.*[2]

---

[1] In deciding a motion to dismiss pursuant to RCFC 12(b)(6), the Court views the facts in the light most favorable to the non-moving party, accepting as true all *factual* allegations in the SAC, but not the legal characterizations or conclusions therein. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

[2] Although Midas indents this description in the SAC, suggesting that it is a quotation, Midas does not provide a citation for the quote. SAC ¶ 2.

A little more than a decade after Midas entered into its lease, however, the government "built a border wall on and adjacent to the surface estate, under which Plaintiffs lease the mineral estate." SAC ¶ 3.[3]  While the government purchased a portion of the *surface* estate from different owners in 2019, acquiring a 14.746-acre tract, the government "did not engage in negotiations with Plaintiffs, the lease-holder of the *mineral* estate of the property, and . . . failed to tender just compensation for the acquisition, interference, and damage to such property interest." *Id.* ¶ 17 (emphasis added).

Midas's claim is that the government's border wall has resulted in a compensable physical taking, thus requiring the government to pay Plaintiffs just compensation pursuant to the Tucker Act, 28 U.S.C. § 1491(a) and the Fifth Amendment of the United States Constitution. SAC ¶ 1.  In particular, Midas alleges that the border wall "interferes with, negatively affects, negatively impacts, and denies access to Plaintiffs' leased mineral estate and real property interests, the majority of which are located south of Defendant's border wall." SAC ¶ 3.

Midas provides some factual details regarding how Defendant's actions may (potentially) pose some interference with Plaintiffs' business operations.  For example, Midas asserts that it is "now unable to drill for and extract minerals from the surface of the border wall footprint itself," making drilling for the minerals "more costly and complicated." SAC ¶ 6.  Midas further avers that an "underground gathering line that moves hydrocarbons from the area south of the border wall to the area north of the border wall . . . is critical for the extraction and transportation of Plaintiffs' minerals" but that "Plaintiffs are now precluded direct access to their gathering line." *Id.* ¶ 7.  Finally, Midas alleges that if it seeks to "install additional gathering line(s) in the future. . . Plaintiffs would necessarily be required to work and route around and/or under the Defendant's border wall structure" resulting "in increased costs." *Id.*

Conspicuous by their omission are any factual allegations regarding: (1) the government's occupation of a physical space Midas owns, leases, or otherwise controls under a cognizable property right; and (2) the government's having altogether precluded Midas from engaging in a particular use of its property interests.[4]

With Defendant having moved to dismiss the SAC, the Court proceeds to determine whether Plaintiffs' alleged facts would, if true, amount to a physical taking under the Fifth Amendment.  *See* SAC ¶¶ 9, 22.

---

[3] Midas alleges that the government began construction of the border wall "[i]n or about 2020." SAC ¶ 18.  The SAC defines the term "border wall" to include "related infrastructure." *Id.* ¶ 1.

[4] The Court acknowledges that Midas has alleged that the wall burdens its access by "preclud[ing] direct access to [its] gathering line," SAC ¶ 7,  but not that its access is altogether precluded.  The point, demonstrated below, is that there is no allegation of an ouster.

### III.    Jurisdiction and Standard of Review

The Takings Clause of the Fifth Amendment prohibits the Government from taking "private property . . . for public use, without just compensation." U.S. Const. Amend. V.  This Court generally has jurisdiction to decide takings claims pursuant to the Fifth Amendment and the Tucker Act, 28 U.S.C. § 1491(a).  *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").

In deciding a motion to dismiss for failure to state a claim as a matter of law pursuant to RCFC 12(b)(6), the Court views the facts in the light most favorable to the plaintiff and accepts as true all *factual* allegations — but not conclusory legal assertions — contained in the complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019).  Those facts must yield a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (citations omitted).  The Court must dismiss a complaint "when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

Ripeness challenges are governed by RCFC 12(b)(1).  *Martin v. United States*, 894 F.3d 1356, 1360–61 (Fed. Cir. 2018) ("The Court of Federal Claims is without jurisdiction to consider takings claims that are not ripe.") (citing *Est. of Hage v. United States*, 687 F.3d 1281, 1285 (Fed. Cir. 2012)); *see also Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affs.*, 464 F.3d 1306, 1316 (Fed. Cir. 2006) ("[R]ipeness is a jurisdictional consideration that the court may address sua sponte." (citing *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003)); *Bassett v. United States*, 136 Fed. Cl. 81, 87 (2018) ("[I]t is proper to dispose of a threshold matter such as ripeness when this court decides, under RCFC 12(b)(1), whether it should exercise jurisdiction over a case[.]"), *aff'd*, 771 F. App'x 479 (Fed. Cir. 2019) (per curiam).

Plaintiffs "bear the burden of establishing the court's jurisdiction by a preponderance of the evidence."  *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).  "In determining jurisdiction, a court must accept as true all *undisputed* facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration*, 659 F.3d at 1163 (emphasis added).  "Although a court is normally not permitted to weigh evidence and find facts in ruling on a motion to dismiss for lack of subject matter jurisdiction, it is allowed to do so where such a motion 'challenges the truth of jurisdictional facts alleged in the complaint.'"  *Knight v. United*

*States*, 65 F. App'x 286, 289 (Fed. Cir. 2003) (quoting *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)); *see also Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) ("A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint.").

## IV.   Discussion – The Court Grants the Government's Motion to Dismiss

### A.  General Takings Principles

In Fifth Amendment takings cases, this Court follows a two-step inquiry as instructed by our appellate court, the United States Court of Appeals for the Federal Circuit. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). We first ask "whether the plaintiff possessed a 'valid property interest at the time of the taking,' and second, 'whether the governmental action at issue amounted to a compensable taking of that property interest.'" *Grill v. United States*, 154 Fed. Cl. 802, 810 (2021) (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)).

The two-step inquiry begins with an examination of property law. "First, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'" *Boise Cascade*, 296 F.3d at 1343 (citing *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000)). While Federal law (*i.e.*, Supreme Court and Federal Circuit jurisprudence) governs the takings issue overall, state law — in this case, Texas law — generally defines the scope of the property right at issue in the first of the two steps. *See Est. of Hage*, 687 F.3d at 1288. That is because "[t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).[5] "Instead, 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Conti*, 291 F.3d at 1340 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)). Such "existing rules often involve and define 'the citizen's relation to the physical thing, as the right to possess, use and dispose of it.'" *Id.* (quoting *United States v. Gen. Motors*, 323 U.S. 373, 378 (1945)).

If the plaintiff has a valid property right, the Court "proceeds to the second step, determining whether the governmental action at issue constituted a taking of that stick." *Boise Cascade*, 296 F.3d at 1343 (quotations and citation omitted).

---

[5] *See also Sharifi v. United States*, 987 F.3d 1063, 1068 (Fed. Cir. 2021) ("The Constitution does not create or define the scope of property interests compensable under the Fifth Amendment." (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003))).

To apply the second step of the two-step framework, the Court must properly classify the nature of the governmental action that gave rise to the alleged taking.  In that regard, "[d]epending on the nature of the governmental action, a taking is classified as either physical or regulatory." *Grill*, 154 Fed. Cl. at 810 (citing *Washoe Cnty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003)).  Generally, a physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).  Some physical takings occur when government regulations appropriate property rights from an owner's "bundle" beyond merely "restrict[ing]" a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 594 U.S. --, 141 S. Ct. 2063, 2072, 210 L.Ed.2d 369 (2021) (finding a *per se* taking of the right to exclude what would otherwise be trespassers where the state granted union organizers a right to enter and occupy the owners' land for three hours per day, 120 days per year).  A regulatory taking, in contrast, occurs when the government "goes too far" in regulating the use of private property.  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

The Supreme Court has carefully distinguished between physical and regulatory takings based on historical, jurisprudential, and policy considerations, with distinct rules and analyses governing each category of taking.  *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) ("A physical taking is a specialized type of governmental action that requires compensation *per se*, and we draw a bright line between the analysis applicable to alleged physical takings and that applicable to regulatory takings.").

"Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321 (2002).  The *per se* rule is that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."  *Id.* (internal citations omitted).  That is because a complete deprivation of some space or physical use creates an obligation for just compensation regardless of how much space or how seemingly trivial the use the government appropriated.  For example, "when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants . . . or when its planes use private airspace to approach a government airport . . . it is required to pay for that share no matter how small."  *Id.* at 322 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and *United States v. Causby*, 328 U.S. 256 (1946)).

"Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries,'" *Tahoe-Sierra*, 535 U.S. at 322. (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, (1978)).  Regulatory takings analysis is "designed to allow 'careful examination and weighing of *all* the

relevant circumstances.'" *Id.* (emphasis added) (citing *Palazzolo,* 533 U.S. at 636). In *Penn Central* itself, the Supreme Court "identified several factors that have particular significance," even as the Court took pains to emphasize that it "has been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co.,* 438 U.S. at 124 (internal quotations omitted). Those non-exhaustive factors include "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" as well as "the character of the governmental action." *Id.*

Finally, the Court in *Penn Central* included, as an additional factor, a presumption against finding a regulatory taking where private property owners are burdened by "some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co.,* 438 U.S. at 124 (internal quotations and citations omitted). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law… and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Id.* (citing *Pennsylvania Coal Co.,* 260 U.S. at 413). In sum, a regulatory takings analysis examines the government action's effect on "the parcel as a whole," *id.* at 131, to see whether and to what extent the action impinges on the owner's ability to use and enjoy his or her property, and whether any impingement is so unfair or onerous as to warrant government compensation. *Id.* at 124.

We begin the two-step takings analysis with an explanation of the scope of mineral-estate rights under Texas property law, before returning to the ultimate question of whether Midas has alleged a takings claim.

### B. The Contours of a Mineral Estate's Property Rights Pursuant to Texas Law

As early as 1915, the Supreme Court of Texas concluded that "for the purpose of ownership and conveyance of solid minerals, the earth may be divided horizontally as well as vertically, and that title to the surface may rest in one person and title to the strata beneath the surface containing such minerals in another." *Texas Co. v. Daugherty*, 107 Tex. 226, 235–36, 176 S.W. 717, 719–20 (1915).[6] While some other jurisdictions had taken the view that "[b]ecause of the fugitive nature of oil and gas, . . . they are incapable of absolute ownership until captured and reduced to possession and analogizing their ownership to

---

[6] *See also Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016) ("Texas law has always recognized that a landowner may sever the mineral and surface estates and convey them separately.").

that of things ferae naturae," the Supreme Court of Texas rejected that line of authority. *Id.* Instead, in Texas, if such minerals "are in place beneath the tract, they are essentially a part of the realty, and their grant, therefore, while in that condition . . . is a grant of an interest in the realty." *Id.; see Keasler v. Nat. Gas Pipeline Co. of Am.*, 569 F. Supp. 1180, 1184 (E.D. Tex. 1983) ("Oil and gas *in place* are, by long established rules of Texas property law, a part of the realty or corpus of the land." (citing *Daugherty*, 176 S.W. 717)), *aff'd sub nom. Keasler v. Nat. Gas Pipeline Co.*, 741 F.2d 1380 (5th Cir. 1984).

Accordingly, even "while they are in the ground," oil, gas, and similar resources — or, more accurately the *rights* to those resources — include "a property interest." *Daugherty*, 107 Tex. at 236. The nature of that property interest "embraces necessarily the privilege or right to take them from the ground." *Id.* To be clear, this means that mineral-rights owners have not only "a mere license to appropriate" but a real property interest as well. *Id.* The implication, of course, is that "the right to the oil and gas" is "an exclusive and private property right . . . of which [an owner] may not be deprived without a taking of private property." *Id.*[7]

Summarizing *Daugherty*, the Supreme Court of Texas explained:

> In that case the only point decided is that an oil and gas lease constitutes property subject to taxation. However, the [*Daugherty*] court is not saying . . . that the possession of all the land leased is necessarily granted to the lessee to the exclusion of the lessor, but merely that the lessee has the exclusive right of possession and use of all or any part of the land necessary for exploration and production of oil and gas.

*Brown v. Lundell*, 162 Tex. 84, 89, 344 S.W.2d 863, 867 (1961). Over time, Texas courts (both state and federal) continued to develop the precise contours of that property interest.

In *Coastal Oil & Gas Corp. v. Garza Energy Trust*, for example, the Supreme Court of Texas considered whether "subsurface hydraulic fracturing of a natural gas well that extends into another's property is a trespass for which the value of gas drained as a result may be recovered as damages." 268 S.W.3d 1, 4 (Tex. 2008); *see id.* at 6-7 (explaining "hydraulic fracturing stimulation," a process "known in the industry" as "frac[k]ing"). The Supreme Court of Texas rejected the trespass claim as a matter of law, holding that the rule of capture precludes it. The rule of capture "gives a mineral rights owner title to the oil and gas produced from a lawful well bottomed on the property, even if the oil and

---

[7] On the other hand, "[t]he minerals do not become personalty until removed from the soil. Whereas trover lies for an unauthorized severance from land of the minerals, one cannot commit conversion of realty. Necessarily, there can therefore be no conversion of oil and gas in place." *Keasler*, 569 F. Supp. at 1184 (citations omitted).

gas flowed to the well from beneath another owner's tract." *Id.* at 13; *see id.* n.37. Thus, the gas the plaintiff in *Coastal Oil* claimed "to have lost simply [did] not belong to him." *Id.*[8] Notably, the plaintiff did "not claim that the hydraulic fracturing operation damaged his wells or the [sandstone] formation beneath his property." *Id.* All of that is crucial for understanding the limits on the ownership rights of oil and gas in place: "[t]he rule of capture determines title to gas that drains from property owned by one person onto property owned by another" and "is justified because a landowner can protect himself from drainage by drilling his own well, thereby avoiding the uncertainties of determining how gas is migrating through a reservoir." *Id.* at 14.[9] This reveals an important limitation on what it means to own minerals "in place":

> While a mineral rights owner has a real interest in oil and gas in place, "this right does not extend to specific oil and gas beneath the property"; ownership must be "considered in connection with the law of capture, which is recognized as a property right" as well. The minerals owner is entitled, not to the molecules actually residing below the surface, but to "a fair chance to recover the oil and gas in or under his land, or their equivalents in kind."

*Coastal Oil*, 268 S.W.3d at 15 (internal footnotes and emphases omitted) (quoting *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935), *Seagull Energy E & P, Inc. v. R.R. Comm'n.*, 226 S.W.3d 383, 388–389 (Tex. 2007), *Texaco, Inc. v. R.R. Comm'n*, 583 S.W.2d 307, 310 (Tex. 1979), and *Gulf Land Co. v. Atl. Ref. Co.*, 134 Tex. 59, 131 S.W.2d 73, 80 (1939)).[10]

---

[8] *But see Coastal Oil*, 268 S.W.3d at 29–30 (Willett, J., concurring) ("True, you cannot recover actual damages for trespass absent injury, but I would approach this case . . . focusing not on the injury caused by the alleged trespass but on whether the underlying act was wrongful to start with. Injury is the result of trespass, not part of its definition, and this case should turn not on the absence of injury but on the absence of wrongfulness. Balancing the respective interests . . ., this type of subsurface encroachment . . . simply isn't wrongful and thus isn't a trespass at all, not just a nonactionable trespass.").

[9] In contrast, "[o]ne cannot protect against drainage from a deviated well by drilling his own well; the deviated well will continue to produce his gas. Nor is there any uncertainty that a deviated well is producing another owner's gas. The justifications for the rule of capture do not support applying the rule to a deviated well." *Coastal Oil*, 268 S.W.3d at 14.

[10] The "rule or law of capture . . . simply is that the owner of a tract of land acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands." *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 581, 210 S.W.2d 558, 561–62 (1948). This means that someone may "appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands, and without incurring liability to him for drainage." *Id.* (explaining that "[t]he non-liability is based upon the theory that after the drainage the title or property interest of the former owner is gone").

Courts interpreting Texas law have taken the principle that "the conveyance of mineral rights ownership does not convey the entirety of the subsurface" very seriously, to the point of concluding that "if there are no minerals beneath the surface[,]" the mineral-rights owner "owns the legal fiction of an estate that is nothing." *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 630 F.3d 431, 441 (5th Cir. 2011) (discussing *Coastal Oil*, 268 S.W.3d at 15). In *Dunn-McCampbell*, the United States Court of Appeals for the Fifth Circuit concluded that the surface owner, not the mineral owner, "owns all non-mineral molecules of the land, i.e., the mass that undergirds the surface" estate. *Id.* at 442. Texas courts have expressly followed the Fifth Circuit in that regard. *See, e.g., Myers-Woodward, LLC v. Underground Servs. Markham, LLC*, 2022 WL 2163857, at *11 (Tex. App. June 16, 2022) ("The conveyance of mineral right ownership does not convey the entirety of the subsurface." (citing *Dunn-McCampbell*, 630 F.3d at 442)), *reh'g denied* (Sept. 6, 2022); *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 283–84 (Tex. App. 2013) (discussing *Dunn-McCampbell*, 630 F.3d at 441-42).[11]

While the mineral estate is characterized as "dominant" vis-à-vis the servient surface estate, this means only that "[t]he lessee ha[s] the right to use as much of the premises, and in such a manner, as was reasonably necessary to comply with the terms of the lease and to effectuate its purposes." *Humble Oil & Ref. Co. v. Williams*, 420 S.W.2d 133, 134 (Tex. 1967); *see also Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016) ("[T]he mineral estate is called 'dominant' and the surface estate 'servient,' not because the mineral estate is in some sense superior, but because it receives the benefit of the implied right of use of the surface estate."). In particular, "[t]he right of the lessee in exploring for and producing oil and gas embraces only the doing of those things expressly granted or necessarily implied in the lease as necessarily incidental thereto." *Brown*, 344 S.W.2d at 866. A "severed mineral estate" thus generally includes "the right to develop" which, in turn, includes "the right of ingress and egress." *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986).[12] It does not mean, "however, that the operator [of the

---

[11] The United States District Court for the District of North Dakota similarly has explained:

> It is well-established in oil and gas law that while a mineral owner has the right to extract minerals from the subsurface, "the **landowner** continues to own both the surface and the subsurface of the lands." 1–2 Williams & Meyers, Oil and Gas Law § 218 (2015) (emphasis added); accord *Emeny v. United States*, 412 F.2d 1319, 1323 ([Ct. Cl.] 1969) (explaining lessee's right to minerals did not eliminate landowners' right to surface "and everything in such lands" except minerals); *Lightning Oil Co. v. Anadarko E & P Onshore LLC*, 480 S.W.3d 628, 635 (Tex. App. 2015) ("[T]he surface estate owner controls the earth beneath the surface estate.").

*Paradigm Energy Partners, LLC v. Fox*, 2016 WL 9496588, at *8 (D.N.D. Sept. 13, 2016).

[12] *See also Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 800 (Tex. 2014) (concluding that mineral lease holder "had the right to use the surface of the tract to develop and remove minerals from it, including the right of ingress and egress to do so"); *Tarrant Cnty. Water Control & Imp. Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993) ("It is a well established doctrine from

mineral lease] may use either the surface or the subsurface in a negligent manner so as to damage the landowner." *Brown*, 344 S.W.2d at 865.

A doctrine of mutual obligation, based in both parties' reasonable exercise of their rights, emerges from these principles. The lease owner's "right[s] must be reasonably exercised with due regard to the rights of the owner of the surface." *Brown*, 344 S.W.2d at 866; *see Tarrant Cnty. Water Control & Imp. Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993) ("Although the mineral estate is the dominant estate, the rights implied in favor of the mineral estate are to be exercised with *due regard* for the rights of the surface owner.").[13] That need to balance the rights of the mineral-estate owners and surface-land owners gave rise to the Supreme Court of Texas's development of the accommodation doctrine. *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974) (noting that "this Court has led the way in conciliating conflicts between owners of the surface and of the mineral rights, and in requiring reasonable accommodations between them" (citing cases)). "The accommodation doctrine, based on the principle that conflicting estates should act with due regard for each other's rights, has provided a sound and workable basis for resolving conflicts between ownership interests." *Coyote Lake Ranch*, 498 S.W.3d at 63. This doctrine frequently requires Texas courts to engage in "the balancing of competing interests in the oil and gas context." *Humble Oil*, 508 S.W.2d at 816 (explaining that balancing "the public policy of developing resources and promoting productive agricultural use[] required an accommodation between the rights of the dominant and servient estates").[14]

---

the earliest days of the common law that the right to the minerals carries with it the right to enter and extract them, and all other such incidents thereto as are necessary to be used for getting and enjoying them." (citing *Cowan v. Hardeman*, 26 Tex. 217, 222 (1862))); *H.B. Taylor v. Brigham Oil & Gas, L.P.*, 2002 WL 58423, at *2 (Tex. App. Jan. 16, 2002) ("incident to the right to extract is the right to explore").

[13] *See also Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 249 (Tex. 2013) (mineral estate owner's "incidental rights include the right to use as much of the surface as is reasonably necessary to extract and produce the minerals"); *Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex. 1980) ("[T]he mineral lessee[] holds the dominant estate, and as such has the right of ingress and egress upon the land for exploration and production of oil and gas. In so doing he must not make an unreasonable use of the surface. If he does he can be held accountable in damages."); *cf. Humble Oil*, 420 S.W.2d at 134 (concluding that where the surface owner "seeks to recover from the lessee for damages to the surface has the burden of alleging and proving either specific acts of negligence or that more of the land was used by the lessee than was reasonably necessary").

[14] The Supreme Court of Texas has further grounded the "[t]he accommodation doctrine" on "th[e] concept of 'due regard'" for the rights of the surface property owner. *Tarrant Cnty. Water Control*, 854 S.W.2d at 911 (quoting *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 622 (Tex. 1971), and explaining that the doctrine is "also known as the 'alternative means' doctrine, [and] was first articulated in *Getty* as a means to balance the rights of the surface owner and the mineral owner in the use of the surface"). Where "the mineral owner or lessee has only one method for

Because "[a]ll property rights not granted are reserved in the lessor[,]" that means "[t]he rights of the lessor and lessee are reciprocal and distinct." *Brown*, 344 S.W.2d at 866. Each party is limited by those reciprocal obligations, such that, "[i]f either party exceeds those rights he becomes a trespasser." *Id.* Accordingly, "[w]hat is reasonable, necessary, or incidental for the severed estate cannot be determined in the abstract but must be measured against, and with due regard for, the rights of the surface estate." *Coyote Lake Ranch*, 498 S.W.3d at 64. A balancing test between the two estates — similar to the regulatory takings analysis — is thus inherent to adjudicating such disputes. As Texas courts have put it, "[t]he rights accruing to the dominant mineral estate, while well-established under Texas law, are not absolute." *Lyle v. Midway Solar, LLC*, 618 S.W.3d 857, 869 (Tex. App. Dec. 30, 2020).[15]

The bottom line is that "what is possessed by the mineral estate owner is the 'fair chance' to recover the minerals." *Paradigm Energy Partners, LLC v. Fox*, 2016 WL 9496588, at *8 (D.N.D. Sept. 13, 2016) (quoting *Coastal Oil*, 268 S.W.3d at 15). But if there are no minerals or they have all been extracted, the mineral rights owner does not have a right to use either the surface or, for that matter, the subsurface. *See, e.g.*, *Myers-Woodward, LLC v. Underground Servs. Markham, LLC*, 2022 WL 2163857, at *11 (Tex. App. June 16, 2022) ("There is no case law that supports a conclusion that a mineral estate owner who does not own the surface estate owns the subsurface of the property and may then use the subsurface for its own monetary gain even after extracting all the minerals." (citing *XTO Energy Inc.*, 584 S.W.3d at 487)), *reh'g denied* (Sept. 6, 2022); *Springer Ranch, Ltd.* 421 S.W.3d at 283–84 ("[W]e note ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances." (citing *Emeny v. United States,* 188 Ct. Cl. 1024, 412 F.2d 1319, 1323 (1969) (per curiam))).

## C.  Plaintiff Does not Allege Sufficient Facts to Support a Takings Claim

Midas contends that the government "has engaged in an unconstitutional *physical taking* of an interest in real property leased and possessed by Plaintiffs." SAC ¶ 9 (emphasis added). Midas alleges that because the government's border wall "has

---

developing and producing the minerals, that method may be used regardless of whether it precludes or substantially impairs an existing use of the servient surface estate." 407 S.W.3d at 249.

[15] A mineral owner's rights to use the surface may be limited by the terms of a lease or other instrument of conveyance. *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995) ("A conveyance of a mineral estate need not dispose of all interests; individual interests can be held back, or reserved, in the grantor."); *see also Coyote Lake Ranch*, 498 S.W.3d at 65 (holding that mineral estate and surface owners may contract for specific use rights, notwithstanding any accommodation doctrine principles). However, "[w]hen an undivided mineral interest is conveyed, reserved, or excepted, it is presumed that all attributes remain with the mineral interest unless a contrary intent is expressed." *Day & Co. v. Texland Petroleum,* 786 S.W.2d 667, 669 n.1 (Tex. 1990).

significantly decreased the value of Plaintiffs' property interest[,]" the government's building of that wall is best characterized as a "physical taking." *Id.* ¶ 22. The fatal problem for Midas is that, as explained above, physical takings "involve a physical occupation or destruction of property." *CRV Enterprises, Inc. v. United States*, 626 F.3d. 1241, 1246 (Fed. Cir. 2010). Here, even construing the factual allegations in Midas's favor, Midas alleges no facts demonstrating a physical occupation or destruction of its mineral estate.

### 1. Midas's Allegations Do Not Support a Physical Takings Theory

Midas alleges only that the government built a structure "on and through the surface estate over and adjacent to Plaintiffs' mineral estate." SAC ¶ 18. By Midas's own admission, the challenge this structure poses to Plaintiffs' business is a partial limitation on *use* or *access*, but is not an occupation or destruction. *See id.* ¶ 19 ("The foregoing acts alleged . . . severely impacted and impaired the Plaintiffs' use and enjoyment of their real property.").

Our takings law precedents, as applied to Texas property law regarding mining rights, reflect that a physical takings claim is only apt where (a) the owner of the mineral estate is ousted completely from the property by some government action, *see Washoe Cnty*, 319 F.3d at 1326, or (b) the government extracts or otherwise confiscates the minerals themselves. *See Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015) (finding appropriation of "personal property" such as raisins carries the same "categorical duty to pay just compensation" as a taking of real property).

Texas property law regarding mining rights requires that both the dominant and servient estates provide the other a "fair chance" to use their own property. *Coastal Oil*, 268 S.W.3d at 15. Midas's interest under Texas law is to have a fair chance to benefit from its mineral estate, limited by the surface estate's owner's fair chance to benefit from its estate. A physical taking claim must thus show that government used the surface estate in such a way as to oust Midas from any fair chance of using its mineral estate or to confiscate the minerals itself. Anything short of that fails to support a claim that a stick in Midas's bundle of rights has been physically taken.

Yet Plaintiffs' SAC is devoid of facts to support either form of a physical takings claim. Plaintiffs do not allege that the government has executed a "practical ouster" by which it "denies all meaningful access to the claimant's private property." *Washoe Cnty*, 319 F.3d at 1326. Just as in *Washoe*, "[b]ecause the government neither physically diverted [n]or reduced the amount of [minerals] accessible by [plaintiffs] nor denied all meaningful access to their [mineral] rights, it did not effect a physical taking." *Id.* at

1327.[16]   Instead, Midas alleges facts that might support, at most, a regulatory takings claim, even assuming this Court could put aside their speculative nature.   Among them: "[t]he border wall has severely impacted and interfered with the use, access, and highest and best use of Plaintiffs' mineral estate," SAC ¶ 19; it has "materially changed the access to the vast majority of Plaintiffs' mineral estate," *id.*; it "creates an impairment of access to Plaintiffs' mineral estate," *id.*; it "has severely impacted and impaired Plaintiffs' use and enjoyment of their real property," *id.*; and "Defendant's conduct has significantly decreased the value of Plaintiffs' property interest," *id.* at ¶ 22.

Nowhere in the SAC does Midas alleges facts amounting to an ouster from its mineral rights, and the only allegation approaching a claim of complete "deprivation" comes in the form of a conclusory statement that is unsupported by any factual allegations.   *See* SAC ¶ 9.

At no point does the SAC suggest that the government has taken or even attempted to take the minerals themselves.   Plaintiffs do not even suggest that the border fence, in fact, somehow invades the mineral estate in a trespassory manner that could give rise to a physical takings claim as was the case in *Loretto*, 458 U.S. 419.   At most, Midas asserts only that "[t]he border wall forever precludes the direct development and extraction of minerals within the footprint of the wall itself."   SAC ¶ 20.   But Midas does not claim that the space taken up by the border wall invades Plaintiffs' property, or that there is an implied right to access the mineral estate via the specific space occupied by the fence itself.   Nor could Midas do so because Texas property law creates mutual obligations, rather than absolute rights, in precisely this kind of situation, and would require a court to balance the interests of the surface owner and the mineral-rights owner.   *See Humble Oil*, 508 S.W.2d at 815 (endorsing a doctrine of "conciliating conflicts between owners of the surface and of the mineral rights, and in requiring reasonable accommodations between them").   Midas cites no authority for the proposition that pursuant to Texas law Midas has a right to the "direct development and extraction" of the minerals in question.

Moreover, a mineral rights owner, under Texas law, does not own the physical subsurface containing the minerals nor the right to exclude others from the surface.   *See Myers-Woodward, LLC*, 2022 WL 2163857, at *11 ("The conveyance of mineral right ownership does not convey the entirety of the subsurface." (citing *Dunn-McCampbell*, 630 F.3d at 442)), *reh'g denied* (Sept. 6, 2022); *Springer Ranch, Ltd.*, 421 S.W.3d at 283–84 (discussing *Dunn-McCampbell*, 630 F.3d at 441-42).   The only physical taking implied in

---

[16] *See also Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1371 (Fed. Cir. 2009) (noting that "a regulation that *prevents* a property owner from accessing private property would implicate a cognizable property interest for purposes of the Fifth Amendment" but holding that plaintiffs "failed to make a sufficient allegation that the government has taken th[e] right" to "reach[] their facilities" (emphasis added)).

the SAC is that of the surface, and possibly the immediate subsurface.  Yet Midas, as a mineral rights owner, does not and cannot allege ownership of the subsurface areas containing the minerals.  *Dunn-McCampbell*, 630 F.3d at 442 (holding that "the conveyance of mineral rights ownership does not convey the entirety of the subsurface").  Accordingly, the SAC alleges no facts that might plausibly raise a *per se* physical takings claim.

A number of other Federal Circuit decisions and other binding precedents further support this Court's conclusion that Midas fails to allege facts demonstrating a categorial taking.  For example, in *Maritrans Inc. v. United States*, 342 F.3d 1344 (Fed. Cir. 2003), Congress enacted a statute that "took away one strand of Maritrans' bundle of property rights by putting limitations on Maritrans' use of its single hull tank barges on the navigable waters of the United States" but that "did not deprive Maritrans of 100% of the beneficial uses of its barges[.]" 342 F.3d at 1354.  The Federal Circuit rejected a categorical takings claim, concluding that "[t]aking away a property's most beneficial use does not by itself constitute a compensable taking."  *Id.* (citing *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979)).  In *Andrus*, the Supreme Court held that "[a]t least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." 444 U.S. at 65-66.  Thus, "[o]nly where Congress takes away every beneficial use does a categorical taking occur."  342 F.3d at 1354 ("The fact that Maritrans' return on its investment may now be less than it originally expected is not enough to make Congress' [statutory] enactment . . . a compensable taking.").

Similarly, the Court of Claims long ago recognized that government action that cuts off or denies "all feasible routes" of access to a plaintiff's property may constitute a compensable taking.  *See Laney v. United States*, 661 F.2d 145, 149 (Ct. Cl. 1981).  The Court of Claims in *Laney* provides an example of a city block surrounded on four sides by public streets.  *Id.*  If the government cuts of access from all four sides, then a taking has occurred.  *Id.*  If the government cuts off access from just one side, and the property is still accessible, there is no taking, "even if the economic fruitfulness of the block is substantially impaired."  *Laney*, 661 F.2d at 149.  In *Foster v. United States*, the plaintiff owned mineral rights on a military base, but the government refused access to that base.  607 F.2d 943, 947 (Ct. Cl. 1979).  The court found a taking because the government permanently *denied all access* to the property.  *Id.* at 950.

Here, Midas does not allege facts to support a physical takings claim under the reasoning in *Maritrans*, *Andrus*, *Laney*, or *Foster*.  *See Cent. Pines Land Co. v. United States*, 107 Fed. Cl. 310, 335–36 (2010) (holding that "to the extent the plaintiffs presented evidence to suggest that operation on portions of Fort Polk would be difficult or uneconomical because of the Army's operations there, that argument is irrelevant to the plaintiffs' physical takings claim" and explaining that "it is well settled that even where the government significantly limits the access to an owner's property, a taking has not occurred, 'even if the economic fruitfulness of the [property] is substantially impaired'"

(quoting *Laney*, 661 F.2d at 149)).  Midas does not allege that all access to its property is cut off.  Midas instead alleges only that its access has been inhibited, burdened, or rendered more expensive.

Applying these Federal takings principles to the Texas accommodation doctrine, this Court has previously explained the difficulty of alleging facts sufficient to support a physical taking of mineral rights:

> The highest Texas court has held that the government surface owner's actual flooding of the surface to create a reservoir would not constitute an interference with or inverse condemnation of the underlying oil and gas mineral interests unless the mineral owners demonstrated that they were thereby deprived of "all reasonable means of access" to their mineral interests, specifically, that straight surface drilling was "the only manner of use of the surface whereby the minerals can reasonably be produced," e.g., that directional drilling would not be a reasonable "accommodation" of the surface owner's right to flood the surface.  The court specifically rejected the Texas Court of Appeals' holding that any diminution in value caused by permanently restricting the most reasonable, lowest-risk and most cost effective means of access—i.e., vertical drilling from dry land—constituted an inverse condemnation.

*Stephenson v. United States*, 33 Fed. Cl. 63, 72 (1994) (quoting *Haupt*, 854 S.W.2d at 912–13); *see also Haupt*, 854 S.W.2d at 909–10 ("We hold that the accommodation doctrine applies and must be considered before a court may determine that an inverse condemnation of the mineral estate has occurred.").[17]

---

[17] In *Haupt*, the Supreme Court of Texas specifically rejected the assertion "that any interference with the use of the surface by a governmental entity constitutes a taking and that the accommodation doctrine does not apply." 854 S.W.2d at 912. That the set of allegations sufficient to state a viable takings claim depends on the precise nature of the property right at issue — here, Texas mineral rights and the state's accommodation doctrine — is not only intuitive, but is borne out clearly in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). In that case, the Supreme Court held that "a trade-secret property right under Missouri law . . . is protected by the Taking Clause of the Fifth Amendment." 467 U.S. 986, 1003–04 (1984). Obviously, a trade secret — being an example of intellectual property (and not physical property) — is not something that is subject to physical occupation or ouster. *Id.* at 1005 (applying *Penn Central* regulatory takings analysis); *see id.* at 1014 (holding that "the EPA's use or disclosure of . . . trade secrets" could constitute a taking). A party also has a property right in its contracts, but unless "the government has stepped into the shoes of a contracting party so as to appropriate that party's contract rights," there is no taking. *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1369 (Fed. Cir. 2009).

Indeed, Texas courts consistently "have suggested that the flooding of the surface is not *per se* a condemnation of the mineral estate, unless by the flooding 'the entire fee will be rendered useless.'"  33 Fed. Cl. at 72 (citing *Pickens v. Hidalgo County Water Control & Improvement Dist. No. Sixteen*, 284 S.W.2d 784, 785 (Tex. Civ. App. 1955), and *Trinity River Authority v. Chain*, 437 S.W.2d 887, 892 (Tex. Civ. App. 1969)); *see also Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132, 1136–37 (Fed. Cir. 2004) (citing Supreme Court decisions for the proposition that it has "uniformly distinguished between those [cases] involving a permanent physical occupation, on the one hand, and those involving . . . a government action outside the owner's property that causes consequential damages within, on the other").

Finally, this Court concludes that Midas's allegations amount to, at best, a regulatory takings claim.  Indeed, Midas's claim here is closely analogous to the riparian rights claims the Federal Circuit declined to deem a physical taking in *CRV Enterprises*, 626 F.3d at 1246.  In that case, plaintiffs asserted that the government's "erecting a log boom preventing plaintiffs from utilizing a slough adjacent to their property" amounted to a physical taking of the water in the slough.  *Id.* at 1243.  The Federal Circuit rejected the argument, concluding that for there to be a physical taking, "[t]here must be a physical appropriation or destruction of the water, not just a restriction on the use of the water that remains in place."  *Id.* at 1248.  Just as the plaintiffs in *CRV Enterprises* alleged their access to the slough (in which they enjoyed riparian rights) had been impeded, Midas alleges its access to its minerals has been impeded (but not fully precluded).  But just as the plaintiffs in *CRV Enterprises* did not allege that the government had taken or ruined their water, Midas does not allege that the government has appropriated or destroyed its mineral estate.

In *CRV Enterprises*, the Federal Circuit explained that "[i]f a mere use restriction that interferes with one of a property owner's rights were enough to support a compensable physical taking, almost every regulatory taking would be a physical taking."  *CRV Enterprises*, 626 F.3d at 1248.  In practice, this would improperly eliminate the careful distinction between the two types of takings.  As Midas attempts to do in the present case, the *CRV Enterprises* plaintiffs "tr[ied] to avoid this result by arguing that it is the '*physical* erection of the boom' as a '*physical* barrier' that constituted the taking."  *Id.*  Midas tries the same erroneous tactic, twice characterizing Defendant's border wall as "a physical impediment."  SAC ¶¶ 7, 20.  But a mere physical impediment does not constitute a physical taking.  A physical structure can impose use burdens (or regulatory compliance costs) without resulting in a physical occupation — let alone a complete deprivation (*i.e.*, an ouster) — that is the hallmark of a physical taking.  "[T]he mere fact that the government's regulatory action included some sort of physical instrument does not change the fact that the government action merely restricted plaintiffs' use of its property and did not physically remove any of the water from the Slough."  *CRV*

*Enterprises*, 626 F.3d at 1248;[18] *see also Washoe Cnty.*, 319 F.3d at 1326 ("A physical taking generally occurs when the government directly appropriates private property or engages in the functional equivalent of a 'practical ouster of [the owner's] possession.'" (quoting *Lucas*, 505 U.S. at 1014)).

It is possible in theory for Midas to have raised a regulatory takings claim based on impaired access to its minerals and the accommodation doctrine under Texas property law. Such a claim would seem a natural fit for the balancing test at the heart of regulatory takings analysis, as the nature of the accommodation doctrine is to balance the burdens and benefits, or reciprocal rights, of adjacent estate-owners. Midas, however, made a strategic decision in this case *not* to assert a regulatory takings claim in the SAC, despite having three bites at the apple between the initial complaint and the two amended versions. Indeed, in Midas's response to the government's motion to dismiss, Midas expressly abandons a regulatory takings claim or such a theory of recovery. Pl. Resp. at 17 ("Plaintiff[s] have not asserted a regulatory taking claim, but a physical taking by the federal government itself."); *see also* Tr. 14:18 (Midas counsel of record admitting that "the way we've pled [the claim] it is a physical taking").[19] These waivers bind Midas.[20] Plaintiffs are thus left without a claim on which to hang their hats.

Even if Midas *had* offered an alternative theory of recovery — that under the Texas accommodation doctrine, Midas is entitled to compensation for a regulatory taking — Midas alleges insufficient facts. As noted above, that doctrine is "based on the principle that conflicting estates should act with due regard for each other's rights," *Coyote Lake Ranch*, 498 S.W.3d at 63, and therefore requires Texas courts to engage in "the balancing of competing interests in the oil and gas context." *Humble Oil*, 508 S.W.2d at 816. Any

---

[18] In *CRV Enterprises,* the Federal Circuit eventually concluded that the plaintiffs in that case also could not assert a regulatory takings claim "because they did not own the property at the time of the governmental action." 626 F.3d at 1243. Clearly, that conclusion does not apply in the present case, as it is undisputed that Plaintiffs own their mineral estate.

[19] *Cf. Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 753 n.1 (Fed. Cir. 2013) ("The plaintiffs do not contend that the facts in this case gave rise to a regulatory taking; they rely entirely on their claim that the government's conduct constituted a physical taking.").

[20] *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1361 (Fed. Cir. 2021) (quoting a concession by counsel at oral argument as evidence a plaintiff fell short of its burden); *Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court and — having staked out his position in response to the district court's inquiry — the appellant cannot now repudiate that position." (citation omitted)); *United States v. Lloyd*, 10 F.3d 1197, 1208–09 (6th Cir. 1993) (concession made by defendant's attorney in district court was binding on appeal); *Adidas Sportschuhfabriken ADI Dassler KG v. Chen*, 1988 WL 1091940, at *7 (N.D. Cal. Feb. 2, 1988) (concluding that a court "is entitled to rely upon and enforce the representations of counsel" because "the Court system would soon fail to function were the Court not able to rely upon representations and stipulations of counsel acting on behalf of their clients").

argument in Plaintiffs' favor would require Plaintiffs to allege facts demonstrating that the government's restriction of Midas's ingress and egress is unreasonable.  *See Coyote Lake Ranch*, 498 S.W.3d at 61 ("[W]here there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee." (quoting *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 622 (Tex. 1971))).

"Reasonable" is the key word.  Determining that a property use or an accommodation is reasonable necessarily depends on several variables.  These include industry standards, economic harms, and the necessity of each tenant's preferred uses of its property.  *See Coyote Lake Ranch*, 498 S.W.3d at 61.  In other words, an accommodation analysis that determines what relation between a private party and the government is reasonable would depend on a totality-of-the-circumstances analysis, with at least some attention paid to the government's interests. It would thus replicate (or closely track) the regulatory takings framework specified in *Penn Cent. Transp. Co.*, 438 U.S. at 124. ("[W]hether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances [in that] case." (internal quotations omitted)).

The SAC, however, is devoid of facts speaking to "several factors that have particular significance," including "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations…[and] the character of the governmental action."  *Penn Cent. Transp. Co.*, 438 U.S. at 124.

Midas has not alleged facts about investment-backed expectations.  Midas has not alleged facts about planned or ongoing mining with which the fence has interfered, or even that Midas has attempted or seeks to attempt to mine any minerals.[21]  Although Midas makes conclusory assertions about the wall generally imposing increased costs on future theoretical mining operations, Midas alleges no *facts* about the costs to the mining operation imposed by the fence.  The failure to include such facts means that this Court is incapable of concluding that Midas states a takings claim as a matter of law (*i.e.*, given the Texas accommodation doctrine), even assuming for the sake of argument that Midas has not abandoned a regulatory takings claim.

---

[21] *Cf. Lyle* 618 S.W.3d at 874 ("The Lyles also have the right to use the surface, but only as an adjunct to their mineral estate. If the Lyles exercise their right as part of developing the minerals, Midway must yield to the degree mandated by the application of the accommodation doctrine. But if the Lyles are not exercising their right, there is nothing to be accommodated.  Stated otherwise, until the Lyles seek to develop their minerals, Midway owes no duty to the Lyles respecting the surface usage.").

### D.  To The Extent Plaintiffs' Takings Claim Depends On Future Government Actions Or Decisions, It Is Not Ripe

The government argues that Midas's takings claim is not ripe because Midas "never lost access to the Mineral Estate." Def. Supp. Br. at 1.  Rather, Midas can access its mineral estate via the Veterans Road crossing, and, even once a gate is constructed there, Midas may obtain gate codes.  *See* MTD at ¶ 23; Def. Supp. Br. at 13.  The Court agrees with the government that, to the extent Midas's claim depends upon future government actions, Midas's claim is not ripe.

A claim "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur  at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations and citation omitted).  The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967).  In evaluating ripeness, a court must consider: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'" *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (quoting *Abbott Labs.*, 387 U.S. at 149; and citing *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383–84 (Fed. Cir. 2012)).

A takings claim does not ripen until a government action "currently impinge[s] on [a plaintiff's] compensable property interest." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1358 (Fed. Cir. 2013).  In *Casitas*, the Court of Federal Claims held that a takings claim was not ripe when the government's operating restrictions had not yet "encroach[ed]" on a municipal water district's right to beneficial use of water.  102 Fed. Cl. 443, 471–72 (2011).  After determining the relevant property interest pursuant to state law, Judge Wiese reasoned that the right to beneficial use "cannot be taken until defendant's action encroaches on plaintiff's ability to deliver water to its customers." *Id.* at 471.  Because "that condition ha[d] not occurred," there was no "present, compensable injury," and the plaintiff's takings claim was "simply not ripe." *Id.* at 472.  In affirming the trial court, the Federal Circuit held that "the Court of Federal Claims properly found that the diversion of water down the fish ladder to date has not impinged on Casitas's compensable property interest — the right to beneficial use.  If and when Casitas has sufficient evidence to file a complaint alleging a compensable injury, Casitas's takings claims will have accrued." *Casitas*, 708 F.3d at 1360.

Applying Texas law to Midas's allegations, this Court concludes that Midas has a real property interest in the form of mineral rights.  *See Rogers*, 772 S.W.2d at 80.  This Court further agrees, as indicated above, that Midas's mineral estate includes "an implied right to the reasonable use of the surface." *Coyote Lake Ranch*, 498 S.W.3d at 64.  This

implied right, however, is subject to the Texas accommodation doctrine, as explained *supra*. *See Tarrant County*, 854 S.W.2d at 909–10. But even if the government's fence could eventually impose a taking, the facts as alleged show at best that Midas has only speculative and inexact concerns about its right of reasonable access to its mineral estate in the future.

### 1. Midas Can Access its Mineral Estate via the Veterans Road Crossing

Midas's primary takings theory is premised on the conclusory allegation that the border wall "preclud[es] all access" to the mineral estate, most of which lies south of the border wall. SAC ¶ 5. But Midas contradicts itself in the very same paragraph of the SAC when it alleges that the government is "*planning* imminent construction of a gate at the Veterans Road crossing." SAC ¶ 5 (emphasis added). This allegation plainly implies that *there is currently no gate there*. Indeed, the government demonstrates that "there has always been at least one gap in the border wall through which Plaintiffs can access, via a public right of way, the surface estate overlying the southern portion of their Mineral Estate." Def. Supp. Br. at 1. Although the government concedes that it is planning to construct a gate at the Veterans Road crossing, construction "has not yet begun." *Id.* at 2. Although the government has built gates at three of the four access points to Midas's mineral estate — at San Juan Road, Doffin Canal, and Doffing Lands — the Veterans Road crossing remains unimpeded. *Id.*

Several other allegations in the SAC also demonstrate that the border wall, in its current form, does not preclude Midas from accessing the southern portion of its mineral estate. *See, e.g.*, SAC ¶ 5 (alleging that the border wall "has severely *impacted and impaired* Plaintiffs' access to its real property" (emphasis added)); *id.* ¶ 19 (explaining that the border wall "creates an *impairment* of access . . . [and that] the continued extraction of minerals south of the border wall is *more problematic*" (emphasis added)). Midas later backtracks on its claim of total obstruction and concedes several points to the contrary. Midas admits that the government has only "partially" constructed the border wall, that the "tenuous access situation has created uncertainty," and that "[a]s to access, Plaintiffs do not claim that the Defendant's actions have led to a total denial of access to the entirety of the mineral estate." Pl. Resp. at 7, 11, 19. These concessions are fatal.

Indeed, as Midas's allegation that the border wall "preclud[es] all access" to the southern portion of the mineral estate is not only disputed by the government, but also contradicted in the SAC and Midas's briefs, the Court need not accept the conclusory "access" allegation as true. *See Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011) ("In contrast to a motion to dismiss for failure to state a claim, in deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true only uncontroverted factual allegations in the complaint." (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993))). For the purposes of ripeness, and thus jurisdiction, the Court finds that Midas has not carried its burden and, if anything, the

record demonstrates that Midas is able to access its mineral estate via the Veterans Road Crossing — at least for now.  *See* SAC ¶ 5.

### 2. Midas May Maintain Access To Its Mineral Estate by Obtaining Gate Codes

To be sure, this "tenuous access situation" may not last forever.  Pl. Resp. at 11. The government does not seek a "partially" constructed border wall, but a complete one. *Id.* at 7.  But even if the government completes construction of the wall and gates, that does not mean that Midas will be unreasonably deprived of access to the surface estate.

Midas alleges that the government "retains complete and total control over the use and functionality of the gates . . . and based on information and belief, Defendant is able to unilaterally determine if and when the gates will be closed and locked."  SAC ¶ 5. Furthermore, the border wall "has caused a direct impairment of access to the mineral estate and a total impairment of access should the Defendant ever decide to close and lock the gates in the wall — a decision that Defendant may unilaterally make at any time for any reason."  *Id.* ¶ 21.  But the SAC does *not* allege that the government has ever "block[ed]" Midas from using the gates, that the government has "told [Midas] that it was going to do so," or that Midas has ever asked to go through the gates.  MTD at 23. Nor does the SAC make any mention of gate codes.

The government, in contrast, argues that "[e]ven after the gates are finished and locked, Plaintiffs [will] still have not lost access," because "Plaintiffs can readily obtain codes that they can use to open the gates."  Def. Supp. Br. at 1.  The government explains that Midas may still obtain access to the relevant surface estate even after the wall is completed and the gates are installed:

> Plaintiffs can use the codes to obtain physical access to the southern portion of the surface estate 24 hours a day, seven days a week.  They can obtain multiple codes to provide them to employees and contractors.  They can even ask the U.S. Border Patrol ("Border Patrol") to unlock the gates for an extended period of time.  All that Plaintiffs have to do to obtain the codes is comply with a limited set of reasonable conditions: (1) provide proof of their property interest so that it can be verified by Border Patrol; (2) inform Border Patrol when employees or contractors that have codes have left Plaintiffs' employ or when the codes have been lost, stolen, or compromised; (3) agree that Border Patrol can restrict access

> through the gates due to an imminent threat to human life;
> and (4) sign a Passcode Holder Acknowledgement form
> ("PHA").

Def. Supp. Br. at 1.  To support this position, the government includes:  (1) a declaration by the government's counsel of record, Def. Supp. Br. at Exhibit 1; (2) a declaration by a Quality Assurance Representative from the U.S. Army Corps of Engineers, *id.* at Exhibit 2; and (3) a declaration by a Border Patrol "Special Operations Supervisor, Tactical Infrastructure Coordinator," accompanied by policy memoranda, slideshow presentations, manuals, and brochures.  ECF No. 43 ("Def. Supp. Decl.") at Exhibits A-H.

In response, Midas argues that the government's submission of "numerous declarations" was improper because these materials should not "be considered by the Court in an attack on the pleadings."  Pl. Supp. Resp. at 1–2 (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).  Although a trial court generally should not consider outside materials when evaluating a motion dismiss pursuant to Rule 12(b)(6), the same rule does not apply when a court evaluates a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  *See Engage Learning*, 660 F.3d at 1355 (explaining that when a trial court evaluates a motion to dismiss pursuant to Rule 12(b)(1), "disputed facts outside the pleadings are subject to the fact finding of the court" (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006))).  Thus, the Federal Circuit has held that a trial court is permitted to consider the government's submissions for the purpose of assessing jurisdictional facts.  *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003).

Midas's allegations suggesting that it will not be able to access its mineral estate through the gates in the border wall do not hold up under the slightest scrutiny.  First, Midas's conclusory allegation that the government "retains complete and total control over the use and functionality of the gates," SAC ¶ 5, is refuted by the government's undisputed gate code policy.  Def. Supp. Decl. ¶ 5.  According to the uncontroverted facts the government has substantiated, Midas will be able to obtain access codes by following a few simple steps.  *Id.*[22]  Indeed, the government substantiates that it offered to provide Midas with gate codes in an effort to resolve the case — before Midas filed its SAC — but Midas sought monetary compensation instead.  *Id.* at Exhibit 1.  The SAC fails to contest

---

[22] There is one small wrinkle.  The Army Corps of Engineers constructs the gates in the border wall and typically transfers ownership and control to CBP once construction is complete, Def. Supp. Decl. ¶ 6, but "[o]wnership and control of the three completed gates has not yet passed to CBP." *Id.* ¶ 11.  While the government "expect[s] the transfer of ownership and control of the three constructed gates to CBP to occur at some point in the near future," the government "do[es] not know the exact date."  *Id.* ¶ 11.  The government promises to "make efforts to generate codes for Plaintiffs to access the three constructed gates as soon as possible after Plaintiffs request them."  *Id.*  Midas offers no rebuttal to this assertion.

these facts and, in that regard, does not even mention gate codes once.  Midas's allegation that the government may lock the gates "at any time for any reason," SAC ¶ 2, is completely speculative, given the government's declaration that once a passcode holder has been approved, the government will only restrict access through the gates "in extreme, imminent, dangerous emergencies where the lives of those in the immediate vicinity of the gates are in danger," Def. Supp. Decl. ¶ 10.

### 3.   Midas's Counsel Concedes That Any Regulatory Takings Claim is Unripe

Plaintiffs' counsel "concede[d]" at oral argument that "as the complaint stands now, there are not sufficient facts to make out a regulatory taking." Tr. 18:14-16.  To the extent that Plaintiffs wish to preserve a regulatory takings argument, they concede in the process that such a claim is not ripe.  *See* Tr. 15:5-19 (Plaintiffs' counsel stating, *inter alia*, "I'm not prepared to concede that there is no regulatory taking, because at this point we don't know the details of the border wall program and access…I don't know that there is a regulatory taking or not yet because I haven't been permitted the opportunity to conduct discovery about what rights of access the landowner has."); Tr. 31:15-17 ("we don't know the details of the border wall program such that we can, at this time, plead a regulatory taking").  With insufficient facts to make out a regulatory taking and a mistaken attempt to shoehorn a set of facts that would indicate a regulatory taking into a physical taking theory, Midas is left with no viable takings claims.

In sum, the SAC fails to demonstrate that Midas will have lost the "reasonable use of the surface" *even once the border wall is complete. Coyote Lake Ranch*, 498 S.W.3d at 64. At best, Midas's physical takings claim hinges on Midas being denied access to the surface estate south of the wall, which has not yet happened, and which appears unlikely to happen. As Midas has not alleged facts sufficient to show that the incomplete border wall "currently impinge[s]" on Midas's mineral estate, the Court must dismiss the case for lack of subject-matter jurisdiction.  *Casitas*, 708 F.3d at 1358; *see Martin v. United States*, 894 F.3d 1356, 1360 (Fed. Cir. 2018) ("The Court of Federal Claims is without jurisdiction to consider takings claims that are not ripe.").[23]

---

[23] Plaintiffs also allege that "the footprint of the border wall extends over and *potentially* downward into the mineral estate."  SAC ¶ 20 (emphasis added).  Even if this were an allegation of *fact*, rather than conjecture, it is not "reasonable to infer" that the border wall harms the mineral estate or Midas's mining prospects.  *McKay v. United States*, 199 F.3d 1376, 1382 (Fed. Cir. 1999). The physical nature of a mineral estate and its treatment under Texas law are such that the government's mere impinging on the subsurface area surrounding the estate cannot *per se* violate Midas's mineral rights.

## V.      Conclusion

In this case, the third time is not the charm.  Plaintiffs' second amended complaint is dismissed for failure to state a claim pursuant to RCFC 12(b)(6).  To the extent Midas's takings claim depends on future government actions or decisions, it is not ripe, and thus is dismissed pursuant to RCFC 12(b)(1).

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge